UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRUSTEES OF TUFTS COLLEGE<br><br>Plaintiff,<br><br>v.<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 509,<br><br>Defendant. | ) | Civil Action No. |

**COMPLAINT TO VACATE ARBITRATION AWARD**

Plaintiff Trustees of Tufts College ("University," or "Tufts") brings this action to vacate an arbitral decision and award ("Award") issued under a collective bargaining agreement with Defendant Service Employees International Union, Local 509 ("SEIU 509" or "Union"). The grievant in the underlying matter, Theodore Simpson, was a teaching professor whose primary responsibilities were teaching and working directly with students. Tufts terminated Mr. Simpson for engaging sexual activity with his girlfriend in his office on campus, directly adjacent to a classroom where a student was working, for violating Tufts' Sexual Misconduct Policy ("SMP"), and for lying during the investigation into his sexual misconduct.

Mr. Simpson's office shares a wall with a classroom/student workspace ("classroom") and while Mr. Simpson was engaged in various sexual acts which were both audible and explicit, a Tufts undergraduate student ("Student") sat just a few feet away in the adjacent classroom, exposed to Mr. Simpson's unwelcome sexual activity while they[1] were trying to do their homework. Once the student – who was enrolled at the time in one of Mr. Simpson's classes – was able to leave the premises, they reported the behavior immediately to the University's Office

---

1 Student identifies with a they/them pronoun.

of Equal Opportunity ("OEO"), explaining they were "horrified," "frozen in panic," feeling "unsafe" and that they understandably "[did]n't want to be prevented from doing my homework because I'm terrified that my professor is having sex in the other room."

Tufts investigated the student's complaint, in accordance with its OEO policies and practices. When the Title IX investigator, Justin McDowell, interviewed Mr. Simpson, Mr. Simpson repeatedly lied, demonstrating a complete lack of accountability and further compounding his egregious misbehavior. Mr. Simpson even raised knowingly false accusations against neutral investigators and students – in a futile attempt to create doubt about his culpability. He did this with full knowledge that he had engaged in the behavior of which he was accused – as he later admitted in graphic and explicit detail. After a full and fair investigation, Tufts terminated Mr. Simpson.

The Union, which represents Mr. Simpson and other teaching professors at Tufts, brought his case to arbitration, claiming a lack of just cause for the termination. Significantly, the Arbitrator confirmed all of the above allegations, finding the following: Mr. Simpson engaged in explicit sexual activity in his office with his girlfriend, directly adjacent to a classroom; that it occurred during a time when he knew students frequented the work area (including the one who was present on the night in question); that Mr. Simpson "violated the SMP by engaging in sexual activity in his office," which specifically calls for the termination of employees for violating it; and, that Mr. Simpson "was not forthcoming during the investigation process, contrary to University Policy."

Despite these findings,[2] the Arbitrator inexplicably sustained the grievance solely on the

---

[2] The Arbitrator similarly found that Mr. Simpson was afforded all the due process to which he was entitled and that the ultimate decisionmaker, "applies the rules evenly, without discrimination."

basis of Mr. Simpson – who she also found to be untruthful – testifying that, "there was no actual penetration," but *only* "rubbing [his girlfriend]'s genital area" and that "[h]er chest was exposed" while she made audible, sexual sounds that were heard in the adjacent classroom. This, despite Mr. Simpson himself conceding at the hearing that there was "no distinction in terms of violation of the policy between penetrative intercourse, oral sex or digital penetration or any of the activities [he] engaged in[.]" Notably, the Arbitrator found Mr. Simpson violated the SMP, which similarly makes no such distinction with regard to the specific sexual acts being performed and the sounds emanating from the same.

The Arbitrator reduced the termination to "reinstatement with full seniority and with a written reprimand on his record for violation of the SMP." This Award violates two dominant and well-defined public policies against sexual misconduct and harassment both in the workplace and in educational settings, under Title VII of the Civil Rights Act of 1966, Massachusetts General Laws, chapter 151B, and Title IX of the 1972 Education Amendments, as well Tufts' obligations under all three laws to eliminate sexual misconduct both as an employer and an educational institution. These laws provide that employees and students are entitled to work and learn in environments free of sexual misconduct (including sexual harassment). Tufts has a legal obligation to promptly and effectively remedy sexual harassment/misconduct in the workplace – which it did, by terminating Mr. Simpson, after it was determined he violated the SMP, and then further demonstrated he could not be trusted about future misconduct when he eventually admitted he lied about his behavior during the investigation.

Implementation of the Arbitrator's reinstatement remedy would require Tufts to place Mr. Simpson back into a role that requires him to be in direct contact with colleagues and students (some of whom are minors), with all the powers of his teaching position, in the face of

his proven and unremorseful behavior that violated Tufts' well-established SMP. This Award violates public policy, as set forth by state and federal anti-discrimination laws.

Further, the Award does not draw its essence from the Parties' CBA, which provides that Mr. Simpson was, "subject to University policies prohibiting discrimination and harassment," including the SMP, which permits Tufts to terminate employees for violations, without any contractual requirement for progressive discipline. It is not disputed and the Arbitrator expressly found that Mr. Simpson violated the SMP by engaging in explicit and loud sexual activity with his girlfriend, while a student sat within easy earshot in the next room, and then lied about it to avoid culpability. The Award granting reinstatement, based upon the peculiar and unwarranted finding that there was no penetrative sex, should be vacated.

## JURISDICTION AND VENUE

1) The University brings this action pursuant to Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, to vacate the arbitration award (the "Award") issued on September 9, 2026, by Arbitrator Elizabeth Neumeier ("Arbitrator"). A copy of the Award is attached to this Complaint and Petition as **Exhibit A.**

2) Respondent Service Employees International Union, Local 509 ("Union") is a labor organization as defined by the LMRA.

3) The LMRA, 29 U.S.C. § 185(c), confers jurisdiction over a labor organization in any district in which the labor organization's duly authorized officers or agents are engaged in representing or acting for employee members.

4) The Union's duly authorized officers and/or agents are engaged in representing or acting for employee members within the District of Massachusetts.

5) The University operates as an institution of higher education within the District of Massachusetts.

6) This Court has jurisdiction over this Complaint under 29 U.S.C. § 185 and 28 U.S.C. § 1331.

7) The LMRA, 29 U.S.C. § 185(a), states that venue in a Section 301 action is proper in any district court of the United States having jurisdiction over the parties.

8) Venue is proper in this district under 29 U.S.C. § 185(a),(c) and 28 U.S.C. § 1391(b).

## PARTIES

9) Tufts is a private institution of higher education with its main campus located in Medford, Massachusetts. Tufts enrolls more than 6,500 undergraduate students and more than 12,000 students total.

10) The Union represents a group of "teaching professors" (previously known as, non-tenure-track full-time lecturers ("FTL")) and has since in or around 2014.

## FACTUAL BACKGROUND

### The Parties' Collective Bargaining Agreement

11) The University and the Union are parties to a collective bargaining agreement ("CBA"), effective June 18, 2025, through June 30, 2029. A copy of the CBA is attached to this Complaint and Petition as **Exhibit B**.

12) Article 13 of the CBA states in relevant part that, "[a] faculty member will not be disciplined, suspended, or discharged without just cause."

13) Article 3.1 of the CBA states, "[i]t is the policy of the University not to discriminate on the basis of race, color, national or ethnic origin, age, religion, disability, sex,

sexual orientation, gender identity and/or expression, genetic information, military or veteran status (special disabled veterans, disabled veterans and Vietnam-era veterans), or any other characteristic protected under applicable federal or state law. It is also a violation of University policy to retaliate against any individual for filing a complaint of discrimination or for cooperating in an investigation of alleged discrimination (protected activity). Unlawful discrimination has no place at the University and offends the University's core values, which include a commitment to equal opportunity and inclusion."

14) Article 3.3 of the CBA states, "[t]he Union acknowledges that, like other University employees, lecturers covered by this Agreement are subject to University policies prohibiting discrimination and harassment, as referenced in this Article." Mr. Simpson was on the bargaining team that agreed to this provision.

15) The CBA does not contain a progressive discipline Article or any similar language requiring that Tufts issue discipline in an escalating manner.

**Tufts' Sexual Misconduct Policy**

16) As referenced in the CBA, Tufts similarly maintains a robust Sexual Misconduct Policy. A copy of the SMP is attached to this Complaint and Petition as **Exhibit C.**

17) The SMP's stated purpose is, "[t]o establish a work, educational and living environment at Tufts University that is free from sexual misconduct, including sex and gender-based discrimination; sexual and sex and gender-based harassment; sexual assault and rape; sexual exploitation; stalking; relationship violence (including domestic and dating violence), and retaliation through guidelines to promote and foster a safe campus climate."

18) The SMP explains that, "Sexual misconduct is prohibited by University policy and may also be prohibited by state and federal law," and defines "Sexual Misconduct" as, "a

broad term used in this policy to encompass unwelcome or unwanted sex or gender-based conduct and/or behavior of a sexual nature that is prohibited by Tufts University and may also be prohibited by federal and state law … Sexual misconduct can occur in any sex or gender configuration (i.e., between those of the same sex/gender or a different sex/gender) and regardless of actual or perceived sex, gender, gender identity, gender expression or sexual orientation."

19) The SMP further defines sexual harassment as, "a form of sex and gender discrimination that involves unwelcome or unwanted conduct of a sexual nature. It can include … other physical or verbal conduct of a sexual nature." While it can include conduct directed at a person because of their real or perceived gender, that is not required, explaining that, "[t]his conduct violates Tufts policy when: … The conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance."

20) The SMP informs employees that violations of the policy are subject to disciplinary action, including the termination of employees. There is no progressive discipline requirement in the SMP.

**Mr. Simpson's Sexual Misconduct, His Admitted Violation of the SMP and Student's Complaint**

21) Mr. Simpson met the girlfriend with whom he was involved in sexual activity in this case, in 2022. Since that time, and at least through the spring of 2025, they had an ongoing emotional and sexual relationship.

22) Mr. Simpson is and was married to someone else during the relevant period. He would bring his girlfriend to his office for dates on a "not infrequent" basis that the Arbitrator described as, "weekly."

23) Mr. Simpson's office was directly adjacent to a classroom. His office shared a

wall with the classroom and had a shared door that led directly from his office into the classroom.

24) The classroom is open until at least 1:00AM. Mr. Simpson was aware that students were regularly in that room at all hours of the day and night.

25) On the evening of March 25, 2025, Mr. Simpson and his girlfriend met for dinner at the Cheesecake Factory before returning to Tufts' campus and his office in Jackson Hall for one of their dates.

26) At the time Mr. Simpson was in his office with his girlfriend, Student was just on the other side of the wall in the adjacent classroom doing schoolwork.

27) While Student was next door, Mr. Simpson and his girlfriend engaged in explicit sexual activity, which he described as the following: "we were standing in the middle of my office, and we started kissing. I remember standing in the middle of my office, and eventually we were seated. It was like a little two-seater there that I bought … and we were seated on that. The kissing continued, and we started touching each other a little bit, a little bit more. At some point -- the two-seater that I have has these two little footrests that you can pull out from under it. So at some point I pulled those footrests out. And when things got a little bit more heated, I would say that -- I was kind of sort of touching her over her clothes and then kissing her at the same time is when things really kind of got more involved."

28) Mr. Simpson further explained that he was also, "rubbing her genital area" and that "[h]er chest was exposed."

29) Mr. Simpson admitted that he and his girlfriend were making sexual sounds at a volume loud enough that Student, seated in the adjacent classroom, could (and did) hear.

30) Student made an audio recording of approximately eight minutes of the sexual

activity which was later provided to Tufts investigators.[3]

31) Once Student was able to leave the classroom, they immediately filed a Complaint through OEO's EthicsPoint, reporting the following:

> I was working on my homework for my Scenic Design class in the classroom next to Ted Simpson's office. I started working at 11 pm. **I sat in the middle of the classroom and heard suspi[c]ious moans coming from his office door which is accessible through one of the classroom walls**.
>
> **I was horrified**.
>
> The male voice sounded like his, I didn't want to believe it but I heard her say Ted at least twice over the course of 15 minutes.
>
> **I was frozen in panic because what is a student supposed to do when they overhear their profess[o]r having intercourse in their office**.
>
> I have his class tomorrow and **I am afraid** of going back because I do not know if what I overheard was another student **or profess[o]r**. Admittedly I stayed in the hallway until she came out and I cannot tell what age she was from the back. I can be asked to provide more details if ne[ce]ss[]ary.
>
> My main concern is that **this was while the building was open in order for me to complete my work**.
>
> **I feel unsafe**.
>
> She came out of his room by 12:20AM. **I don't want to be prevented from doing my homework because I'm terr[i]fied that my profess[o]r is having sex in the other room**.
>
> They also took a pause to talk about "color scheme" which makes me nervous it's a student. I heard him say "easy access" directed at her, glass being jostled/dropped, moaning, and one of them said "take it off" reffering [sic] to their clothes.
>
> **Regardless of who the female individual was, please make him**

3 Bizarrely, the Arbitrator stated that Student, "tried to peek into Grievant's office, and used their phone to take videos under the door." It should be noted that there was no testimony or evidence to support this baseless statement.

> **stop having sex in his office** because I fear with the confidence I overheard this is not the first time. (Emphasis added).

The Arbitrator admitted this statement into evidence.

**Investigation Into the Student's Complaint and Mr. Simpson's Untruthfulness**

32) Given the nature of the allegations – i.e., a faculty member engaging in sexual misconduct in an academic building on campus – OEO investigated Student's Complaint in accordance with its normal policies and procedures.

33) During the investigation, Mr. Simpson lied several times to investigators, conceding at the hearing that, "I could have been more candid, sure."

34) Investigator McDowell informed Mr. Simpson explicitly that Tufts, "received a credible report that indicates there was sexual activity involving you and a female in your office during that late-night timeframe." He then asked Mr. Simpson, "[a]re you aware of any situation in which someone could have believed that sexual activity was happening?" Mr. Simpson, despite knowing the truth, stated that the "only thing" he could think of was that it may have been the sound of a sexually explicit movie, "Betty Blue," that he said he and his girlfriend were watching.

35) Investigator McDowell followed up and asked, "[i]s there any reason someone might fabricate or misunderstand what was happening in your office?" Mr. Simpson again lied, responding that, "[t]he movie is the only conclusion I could come to."

36) After the interview, Investigator McDowell asked Mr. Simpson to provide the portion of Betty Blue that he claimed he was watching during the night in question. Rather than come clean, Mr. Simpson furthered his lies and provided timeframes in the movie that sex scenes occurred. Investigator McDowell compared the movie to the sexual sounds on the audio recording and it was quickly determined that the sounds Student heard were *not* from Betty Blue,

a fact Mr. Simpson later admitted.

37) As the investigation proceeded, Mr. Simpson raised baseless accusations about Investigator McDowell and the anonymous Student, claiming bias as to the former, and retaliation as to the latter. He raised these baseless claims while knowing that the allegations against him were true.

38) At the conclusion of the investigation, Investigator McDowell correctly determined that Mr. Simpson had violated the SMP by engaging in sexual activity in his office, within earshot of a student studying.

39) Upon receiving OEO's Report, and after meeting with Mr. Simpson, the Dean of the School of Arts and Sciences, Dr. Bárbara Brizuela, made the decision to terminate Mr. Simpson, issuing a termination letter which stated, in part,

> As outlined in OEO's report, the investigation found that you violated the Tufts Sexual Misconduct Policy and contributed to a hostile academic environment. In addition, the report concludes that you were not forthcoming during the investigation process which is also inconsistent with University policy. The report raises serious concerns about your judgment, accountability, and engagement with the University's procedures.
>
> After a thorough review of the findings and all applicable University policies, and after considering what you shared with us during our meeting on Tuesday July 1, the University is terminating your appointment as Distinguished Senior Lecturer at Tufts University. This decision is based on the conduct described in the report and due consideration of our meeting of July 1.

**Arbitrator's Decision**

40) Pursuant to the CBA, the Union filed a grievance on July 7, 2025, asserting that Mr. Simpson was terminated without just cause in violation of Article 13 of the CBA.

41) After a two-day hearing and site visit with the Arbitrator to Mr. Simpson's office and the adjacent classroom, Arbitrator Neumeier issued the Award on September 9, 2026.

42) The Arbitrator found that Tufts established by a preponderance of the evidence that Mr. Simpson had notice of the SMP.

43) The Arbitrator found that the Union did not contest that the SMP was reasonable, and the Arbitrator held the same.

44) The Arbitrator found that the Union did not contest that Tufts undertook an investigation.

45) The Arbitrator found that the Union did not establish any bias on the part of Investigator McDowell in conducting his investigation.

46) The Arbitrator found that Tufts established that the investigation was conducted fairly.

47) The Arbitrator found that Mr. Simpson, "engaged in sexual activity in his office on March 25-26, within the hearing of [Student], conduct that was 'unwelcome' and 'unwanted.'"

48) The Arbitrator found that Mr. Simpson, "violated the SMP by engaging in sexual activity in his office on March 25-26."

49) The Arbitrator found that Mr. Simpson, "was not forthcoming during the investigation process, contrary to University Policy."

50) The Arbitrator found that, "Dean Brizuela applies the rules evenly, without discrimination."

51) However, despite all these findings, the Arbitrator ordered that Mr. Simpson be reinstated with full seniority and with a written reprimand on his record for violation of the SMP. In light of Mr. Simpson's failure to be forthright in the investigation, the reinstatement did not include back pay or benefits that would have accrued since his termination.

52) The sole basis for finding that the grievance had merit was the Arbitrator's unsupported finding that penetrative sex in one's office is more egregious than stimulating another's genitals while their chest is exposed and making audible, sexual noises. The Arbitrator incorrectly described that distinction as being the "critical conclusion," in OEO's Report. It was not.

53) Indeed, Investigator McDowell's Report stated explicitly that, "[w]hether the activity amounted only to 'kissing and affection,' as [Mr. Simpson] now claims, is immaterial: the Sexual Misconduct Policy focuses on unwanted exposure to sexual conduct, not on the precise sexual act performed."

54) By Investigator McDowell's own Report, it is clear that the level of sexual activity – i.e., whether there was penetrative sex, as opposed to mutual touching, genital stimulation by Mr. Simpson while his girlfriend's chest was exposed and making audible sexual noises – was not a critical factor in his finding. Nor was it the basis of Dean Brizuela's termination decision.

55) Mr. Simpson himself admitted that OEO's belief that sexual intercourse had occurred, based on the sounds coming from his office, was not an unreasonable conclusion.

56) Mr. Simpson similarly conceded that there was no distinction in terms of his violation of the SMP between penetrative intercourse, oral sex or digital penetration and any of the activities he admits to engaging in while in his office.

## <u>GROUNDS TO VACATE THE AWARD</u>

57) Paragraphs 1 through 56 are incorporated by reference as if fully set forth herein.

58) Both Massachusetts law, M.G.L. c. 151B *et seq.,* and federal law, Title VII of the Civil Rights Act of 1964, support a dominant and well-defined public policy against sexual misconduct and harassment in the workplace.

59) Title IX of the 1972 Education Amendments similarly supports a dominant and well-defined public policy against sexual misconduct and harassment in all of the University's programs and activities.

60) As an employer in Massachusetts and institution of higher education that receives federal funds, Tufts has an affirmative legal duty to prevent and effectively respond to workplace and educational sexual misconduct and harassment.

61) The Award, which returns Mr. Simpson to his role in the academic environment, despite the Arbitrator's findings that he engaged in audible sexual activity in his office, violated the SMP, and lied about that violation during Tufts' investigation, is contrary to the dominant and well-established public policy against sexual misconduct and harassment in workplace and educational settings, and an employer's obligation under federal and state law to remedy discrimination and harassment.

62) Further, the Award does not draw its essence from the CBA. Ordering reinstatement with a written reprimand, based on the Arbitrator's own subjective view that for termination to be appropriate Mr. Simpson was required to admit to penetrative sex (instead of other forms of explicit sexual activity that are audibly the same), is not consistent with the Agreement, the SMP and Tufts' obligations under both.

63) In issuing the Award, the Arbitrator exceeded her authority and dispensed her own brand of industrial justice.

64) An Award that reflects the Arbitrator's own notions of industrial justice rather than the parties' agreement fails to "draw its essence from the contract" and may be vacated by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Tufts prays for relief against the Union as follows:

1. An order vacating the Arbitrator's Award; and,

2. Any further relief as the Court deems just and proper.

Respectfully Submitted,

TRUSTEES OF TUFTS COLLEGE,

By their Attorneys,

*/s/ Damien M. DiGiovanni*
Damien M. DiGiovanni (BBO No. 682005)
Brendan T. Sweeney (BBO No. No. 703992)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109-2605
(617) 523-6666
ddigiovanni@morganbrown.com
bsweeney@morganbrown.com

Dated: October 9, 2026