# EXHIBIT A

# ARBITRATOR'S OPINION AND AWARD

In the Matter of Arbitration Between:

September 9, 2026

SEIU, Local 509
Union

and

Tufts University
Employer

LRC Case No. 569-25
(Grievance: Theodore Simpson – termination)

Before

Elizabeth Neumeier, Arbitrator

Representing:

The Union: Patrick N. Bryant
PYLE ROME EHRENBERG PC
2 Liberty Square, 10th Floor
Boston, MA 02109
Tel: 617-367-7200
pbryant@pylerome.com

The Employer: Damien M. DiGiovanni, Esq.
Brendan P. Sweeney, Esq.
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
Tel: (617) 523-6666
ddigiovanni@morganbrown.com

Statement of the Award: The grievance is []

**BACKGROUND**

Tufts University ("the Employer" or "the University") and SEIU, Local 509 ("the Union") are parties to a collective bargaining agreement ("CBA") effective June 18, 2025 through June 30, 2029. Pursuant to that CBA the Union filed a grievance on July 7, 2025[1], protesting that Grievant was terminated without just cause in violation of Article 13 of the CBA. As remedy, the Union asks that Grievant be reinstated and made whole.

By mutual agreement the Union directly submitted the grievance for arbitration pursuant to Article 8 of the CBA. The undersigned Arbitrator was selected through the auspices of the Labor Relations Connection and hearings were held on April 6 and 15, 2026, at which both parties were represented by counsel and were afforded the opportunity to introduce exhibits, and to present witnesses and cross examine opposing witnesses. A transcript was taken. The undersigned Arbitrator made a site visit, accompanied by both representatives and Grievant, on May13, 2026. Both parties submitted post-hearing briefs.

The University is divided into 10 schools. The School of Arts and Sciences ("School" or "A&S") is divided into 26 departments and a dozen interdisciplinary programs. A&S faculty consists of tenured and tenure-track faculty; teaching professors or non-tenure-track full time lecturers ("FTL"); and non-tenure track part-time lecturers ("PTL"). Grievant was a FTL at A&S.

The Union was certified as the collective bargaining representative in 2014 or 2015.

The Employer offered three witnesses. Justin MacDowell ("Investigator MacDowell") at times relevant here was employed as the University's Title IX investigator and conducted the investigation into the complaint that had been received on March 26. Jill A. Zellmer, who as Associate Vice President of the Office of Equal Opportunity ("OEO") serves as the Title IX Coordinator and the Title VI Officer ("AVP Zellmer"), testified about receiving and reviewing the complaint from a student, Anonymous Witness 1, ("AW1" or "Reporter" or "student") assigning Investigator MacDowell, and interactions with Grievant. Barbara M. Brizuela, Dean of A&S ("Dean Brizuela") testified about her decision to terminate Grievant.

The Union offered Grievant as its only witness. Grievant had been employed by the University in the Theater, Dance and Performing Arts Department at A&S since 2002. He recently achieved the highest rank ("Distinguished Senior") as a FTL, the first theater lecturer to do so. Grievant testified about the investigation and what had occurred the night of March 25-26. Grievant also testified about his Union activities, having participated in organizing the teaching faculty bargaining unit in the 2010s and serving as a steward and on committees.

As a FTL Grievant's primary responsibility was to teach and work with students. Although FTLs have a teaching load equivalent of six courses per academic year, Grievant worked in set and design production in the Drama Department, a position in which he would

---

[1]All dates are 2025 except as noted.

often receive three (3) course equivalences for the production work he performed on shows. Grievant thus had fewer structured classroom hours and the hours he worked varied widely.

Grievant's office, which he occupied for 22 years, was in the basement of the Jackson Gym building ("the Jackson"). There is a room, also used as a design studio and student workspace, adjacent to his office ("the classroom"). The door connecting the office and classroom is kept closed with the window curtain drawn. The Jackson is regularly open until 1:00 AM, with students and others coming and going.

Late the evening of March 25 Grievant was in his office with his friend, KM. KM is not affiliated with the University in any way. AW1, a student who was taking a course with Grievant that semester, was in the adjacent classroom studying by herself.

At 1:33 AM on March 26 AW1 anonymously logged on to EthicsPoint. EthicsPoint is an online reporting site that allows those making a report to OEO to select anonimity. AW1 made the following anonymous entry:

> I was working on my homework for my Scenic Design class in the classroom next to [Grievant's] office. I started working at 11 pm. I sat in the middle of the classroom and heard suspisious [*sic*] moans coming from his office door which is accessible through one of the classroom walls. I was horrified. The male voice sounded like his, I didn't want to believe it but I heard her say Ted atleast [*sic*] twice over the course of 15 minutes. I was frozen in panic because what is a student supposed to do when they overhear their professer [*sic*] having intercourse in their office. I have his class tommorow [*sic*] and I am afraid of going back because I do not know if what I overheard was another student or professer [*sic*]. Admittedly I stayed in the hallway until she came out and I cannot tell what age she was from the back. I can be asked to provide more details if nessecary [*sic*]. My main concern is that this was while the building was open in order for me to complete my work. I feel unsafe. She came out of his room by 12:20AM. I don't want to be prevented from doing my homework because I'm terrfied [*sic*] that my professer [*sic*] is having sex in the other room. They also took a pause to talk about "color scheme" which makes me nervous it's a student. I heard him say "easy access" directed at her, glass being jostled/dropped, moaning, and one of them said "take it off" reffering [*sic*] to their clothes. Regardless of who the female individual was, please make him stop having sex in his office because I fear with the confidence I overheard this is not the first time. [EX. 1, pg.1.]

AVP Zellmer received the above complaint shortly after it was filed. She promptly assigned Investigator MacDowell to do an investigation.

On April 1 Investigator MacDowell interviewed AW1, who prefers the "they" pronoun. He recorded AW1's description of what had occurred in his notes as follows, in part:

> They arrived between 10:30pm – 11:00pm and began working on a class project. About 30 minutes later they heard male-and-female voices through the shared interior door, which AW1 called "thin, you can hear through it." The conversation became "kissing sounds," then more explicit, sexual noises. AW1 distinctly recalled three phrases: a male voice said "easy access," one voice said "take it off," and a female voice twice moaned "Ted," all within roughly 15 minutes.
>
> Believing a student might be involved, AW1 "froze" and felt responsible to verify. They noted a classmate of theirs "sucked up" to Ted and they were worried it was that person. They heard a brief comment about "color options", language AW1 associates with set-design course work, which reinforced that suspicion. Once the moaning grew "obvious," AW1 placed their phone near the door and recorded eight minutes of audio/video. [EX 2, Appendix G.]

On April 3 Investigator MacDowell sent the Grievant an email, via Onehub, a platform to protect confidentiality that does not permit downloading, suggesting possible times to meet on April 4, 7 and 8. (EX 2, Appendix E.). The "Notice of Administrative Investigation and Allegations" ("the Notice") was attached and states, in relevant part:

> The Office of Equal Opportunity (OEO) is initiating a formal complaint on behalf of the University regarding allegations of behavior(s) you may have engaged in that would violate Tufts University policy, including misconduct alleged to have occurred on the night of March 25, 2025, into the early morning of March 26, 2025.
>
> Specifically, the University received a credible anonymous written report that you engaged in or pursued a sexual and/or romantic relationship with an undergraduate student ("Student X") and engaged in sexual activity with Student X in your office on campus. Around 11:30pm , an individual reported hearing heard [sic] sounds of persons engaged in intercourse; the reporter was trying to study in a room next door. The reporter found the loud noises to be sexually offensive and unwelcome. The witness reported Student X stated, "Ted," twice in 15 minutes during the events overheard. At 12:20am, the witness observed Student X exit your office and enter a nearby restroom.
>
> This letter serves as formal notice that Tufts University will be

conducting a prompt, thorough, and impartial investigation of these allegations pursuant to the procedures detailed in the Relationships with Students Policy and the Sexual Misconduct Policy (SMP). More information on these policies can be found here and viewing of our flowchart of the process can be helpful regarding what to expect. This grievance process is compliant with applicable federal and state law.

Specifically, the following provisions of the following Tufts University policies are implicated:

- **Relationships with Students Policy – § 3: 'Prohibited Conduct'**
- **Sexual Misconduct Policy – § III(B): 'Sexual or Sex- and/or Gender-Based Harassment**

As the Relationships with Students Policies being invoked, there are two choices of the processes investigation may be conducted under. Please inform the signed Investigator which process you would like to choose:

- The **Sexual Misconduct Adjudication Process with Direct Cross Examination** includes a live hearing in front of a three-person decision-making panel after the investigation concludes,
- or the **Discrimination Complaint Processing Guidelines**, which does not involve a hearing in front of a panel.

You are considered "not responsible" for violating Tufts policy unless and until a preponderance of the evidence proves that a violation of policy has occurred. The burden is on OEO to gather evidence, investigate the allegations, summarize all relevant evidence in a final investigation report, in which a final determination is made, subject to appeal.

Individuals who are found to have violated Tufts University policy is subject to one or more of the following sanctions (non-exhausted): formal reprimand, loss of privileges, disciplinary probation, suspension, or termination of employment.

Should additional allegations emerge over the course of this investigation, this office will provide you with an updated and revised Notice of Investigation and Allegations.

* * *

> Investigation and Interview
>
> Justin MacDowell, Title IX Investigator…has been assigned to this matter. Investigator MacDowell is a neutral professional whose role is to objectively collect and compile all available information relevant to the allegations, and compose a thorough, detailed investigation report. He will be taking notes during the interview. Note taking is allowed during interviews but audio/visual recordings of interviews are not allowed.
>
> If you have any concerns about Investigator MacDowell's potential bias or conflict of interest, please raise them with Executive Director Zellmer prior to your scheduled interview
>
> Advisor
>
> * * *
>
> Retaliation Prohibited
>
> * * *
>
> False Statements and/or False Information
>
> * * *
>
> Confidentiality
>
> * * *
>
> Resources and Support
>
> * * *
>
> [UX 2.]

Grievant responded on April 4 stating, in relevant part:

> After 22 years at Tufts without a single complaint, I find these allegations extremely troubling. I am quite upset and sad about them and would like to clear this up as soon as possible. I do think it would be in my best interest to have my union rep Anna Meier (I have copied her here) present for this interview and I'm waiting to find out her availability. We are hoping for Monday morning but should have an answer for you at some point today. [UX 2.]

On April 7 Dean Brizuela placed Grievant on paid administrative leave pending the outcome of the OEO investigation.

On April 7 Inspector MacDowell interviewed Grievant, who was accompanied by SEIU Local 509 Representative Anna Meier ("Union Representative Meier"), via Zoom. Inspector MacDowell took notes (EX 3, Appendix G), as did Union Representative Meier (UX 7).

On April 8 Inspector Macdowell emailed Grievant regarding the film "Betty Blue," asking him to:

> provide the timestamps for approximate time range within the film, as well as any relevant contextual cues or dialogue. Please also indicate whether how [sic] this movie was playing (laptop or TV) and in what format (streaming or physical copy). This information will help ensure that we conduct a thorough and fair assessment of your explanation. [EX 2, Appendix F.]

This request was in reference to Grievant's description of the film "Betty blue" that he and KM had been watching. Grievant had stated that sexual sounds in that film could have been overheard by AW1.

On April 8 Inspector MacDowell interviewed KM and took notes. (EX 4.)

On April 9, in response to Inspector MacDowell's inquiry about the "Betty Blue" film, Grievant wrote:

> … I will tell you that we sometimes watch things on my iPad and sometimes we watch them on a TV monitor that is connected to the iPad using a USB-C to HDMI connection. The movie is in the library on my iPad so it was not streaming. We did not watch much of the film. Probably the first 20-30 minutes but it's over 3 hours long so we decided to come back to it another time. The scene I was thinking of is at the beginning of the film. It starts at about 1:50 and goes until about 3:50. We watched that section more than once because we had a prior conversation about whether the sex simulated or not. So it was stopped, rewound, paused etc. I cannot say for sure where or how often. This movie was nominated for best foreign film so please don't get the idea that it was pornographic. I will also say that I'm not sure if there are multiple versions of the film out there (R vs NC-17 for instance). I'm pretty sure the version we watched was the original theatrical release.
>
> I also want to clarify that I believe what I said in the interview was that I wasn't sure when we watched it. It was recently. Based on the complaint I was assuming it was that night. [EX 2, Appendix E.]

On April 14, in a series of emails with AVP Zellmer, Grievant wrote, in part:

> ... In the meantime I have a concern about Justin.
>
> There were a few troubling things that came from Justin's interview with [KM] (the friend who was in my office) the other day, but the one thing that I think concerns you at this point is a statement Justin made during the interview. [KM] told me that at one point during questioning Justin said to [KM] "I know exactly what happened in that office". Not only does this strike me an unprofessional thing to say to a witness, but it certainly betrays his position as an unbiased fact gatherer. It makes it seem like his investigation is more agenda driven than fact driven and it makes me feel like working with him might not be in my best interest.
>
> I also have further information on the legality of the recording, but I'm consulting a lawyer on this first. [UX 9.]

AVP Zellmer responded shortly thereafter stating that she had reviewed the notes taken by Investigator MacDowell and did not see the comment Grievant had reported. She stated, in part:

> However, if you feel Justin is not neutral then the best path forward for you is to request an adjudication panel since they would be the ones to make a decision in this matter based on the facts found.
>
> I am sure you are aware of this but prior to any outcome, you have the right to review the draft report and submit a rebuttal document of what you think the investigator got wrong or didn't capture accurately. This is your last due process step in the investigation phase before the report goes to the decision-maker, either by a panel or by the investigator. Your rebuttal document, if you choose to submit one, is carefully reviewed and often can change/modify the report before it is finalized for an investigator to make a final decision before the report goes to the panel for an adjudication hearing (depending on which process you choose). [UX 9.]

On April 18 Grievant notified AVP Zellmer that he had decided to select the discrimination complaint process under the Discrimination Complaint Processing Guidelines ("DCPG") and not the adjudication panel under the SMP process. (EX 3.)

On April 22 Grievant emailed Investigator MacDowell, with a copy to Union Representative Meier, raising a number of concerns about the time line of events, the possibility of hearing what is being said inside his office when the two doors are closed and the recording of what AW1 overheard. Specifically he said that Massachusetts is "a two-party consent" state, meaning both parties need to consent to being recorded." He stated:

> Even though the laws are rarely prosecuted and I have no intention of pursuing it, the complainant in this case would be open to prosecution and civil litigation. I do not understand how it is legal to use this recording in your investigation. [EX 2, Appendix F.]

Grievant further raised the possibility that "the complainant could have been retaliating against me."

Investigator MacDowell provided Grievant with a draft of his report and, for the first time, Grievant was permitted to listen to the recording (EX 2, Appendix H), at a Tufts office with an OEO staff member present. In his eight-page rebuttal to the draft OEO report, Grievant made the following points:

– He described his relationship with KM, and their regular weekly get together that included practicing swing dancing and spending time in his office after dinner, often watching films and TV shows while he did some work.

– He explained why he thought scenes from "Betty Blue" might explain the sounds on the recording. Stating:

> When I read the allegations, I thought this film might have been what was heard in my office on the 25th. Knowing how sound carried in those spaces (my office in the classroom), an augmented sound through a speaker system made the most sense to me. I was not sure when we watched it, but based on the complaint I thought it might be that night. Had we been watching that, you would have heard us talking, stopping the film, rewinding etc. It would have been a bit obvious. When asked if we watched "these sorts of things" often in my office, I took the question to mean films and, television shows in general, not films with intimate scenes. Based on the OEO report it seems like the 25th was not the night we watched Betty Blue, but it is worth stating that when Betty Blue was watched, it was behind closed doors with discretion and no complaints. [EX 2, Appendix I.]

– He stated he was unaware that having a non-Tufts affiliate in his office at night was a policy violation, and said that many faculty members do so regularly.

– He stated that he did not think that AW1's assumption that he was with a student was fair because numerous female colleagues meet in his office, in the building late, and "there was not even the slightest suggestion of anything inappropriate between [him] and any of their classmates in the Set Design class. The complainant simply had no reason or basis to think this was a student."

– With respect to AW1's claim that she heard someone moaning "Ted," Grievant noted

that KM calls him Theo and has never called him Ted. Further, no one in the office said "take it off" and he doubted anyone said "easy access". KM has a red coat and there was no red robe.

– Grievant notes that while AW1 claims to have been too distracted by the sounds to work, the recording starts before there are any "sexual" sounds.

– Grievant described having had many private or delicate conversations in his office with students, faculty and staff, with no fear that the rest of the class could overhear because it is very difficult to hear anything clearly in that classroom from the other side of that door. He noted that AW1 recorded with the phone pressed against the door and even under the door to capture what was happening in the office. Thus, the recording itself is no indication of what could or could not be heard in the workspace, and the sounds could not be categorized as "loud" or "explicit."

– After hearing the recordings, Grievant acknowledged that he and his friend "let our emotions get the best of us" to his great embarrassment in a place where a student was able to hear. He expressed that he wished he could apologize to the anonymous complainant.

– Grievant noted that over the years through his union work he heard many complaints about the Title IX process and said he now understands that perspective. During the process he was "only introduced to evidence through the investigator's questions. I was not allowed to see any of the actual evidence until after the investigation was complete." Further, the Investigator showed little to no interest in speaking with KM, and Grievant felt he needed to insist that the investigator do so.

On June 10 AVP Zellmer notified Grievant, via a "Close Out Letter," that the OEO had concluded its investigation, stating, in relevant part:

> Investigation focused on concerns that you engaged in sexual activity with an individual in your office, conduct which was audibly overheard by a student ("Reporter") standing in a nearby room. The OEO investigation assessed whether such conduct violated Tufts University's Sexual Misconduct Policy and/or the Relationships with Students Policy, the latter because the Reporter assumed you were with a student.
>
> By a preponderance of the evidence, OEO determined that you engaged in sexual activity with a non-Tufts individual in your on-campus office on the night and early morning of March 25-26, 2025. OEO confirms the sexual activity and found it took place a few feet away from the reporting student who was studying in an adjacent academic room. The Reporter heard sexual noises which they immediately and anonymously reported to OEO. Although

> you denied the alleged conduct throughout the investigation, you admitted to the conduct in your rebuttal statement to OEO at the end of the investigative process. Based on the admitted sexual conduct and the reported impact on the student, OEO has found your conduct to be objectively and subjectively offensive. Further, engaging in sexual activity on-campus in one's office, where the presence of students is all but guaranteed, is sufficiently serious enough to create a hostile academic environment. As such, OEO finds this conduct to be a violation of the Sexual Misconduct Policy and will refer the matter to your Department Chair, the Dean of the School of Arts & Sciences, the Office of the Provost and Human Resources for appropriate review and action in accordance with the findings of this investigation.
>
> It is important to note that the OEO dismissed the Relationships with Students Policy allegation against you because there was insufficient evidence during the investigation to show that you were with a student in your office that night.…
>
> Regardless of intent, your conduct resulted in a serious disruption to at least one student's academic experience and compromised the standard of professional conduct expected of University faculty. [UX 9.]

Grievant responded on that date, thanking AVP Zellmer for her "candor and professionalism" and further stating:

> I would like to discuss your office's continuing suggestion and/or allegation that I lied or was deceptive through this investigative process. I strongly contend that this was not the case. [UX 9.]

AVP Zellmer responded that Grievant could send any documentation to her directly and she would make sure it went into his OEO file.

On June 13 Grievant emailed AVP Zellmer as follows, in relevant part:

> Attached you will find transcripts of my interview with Justin along with a transcript of [KM's] interview with Justin. At no point in either interview do I (or [KM] for that matter) deny any activity in my office. We are in fact never asked directly if such activities ever happened. What we are asked is to explain the existence of a recording that contains the sounds of sexual activity. At that time, given what I knew of the recordings and having never seen or heard them, the most feasible explanation was a film we had watched. What I did not know at the time was that the

> recording was made with the phone directly up against and even under my closed office door. Regardless I would certainly not characterize this as a categorical denial as the report states and I resent the implication that I was anything less than cooperative with this investigation.
>
> It's also worth noting that in Justin's interview with [KM], he does indeed state that he knows everything that happened in that room. [It's] also I believe, worth noting that when interviewing a single woman who is alone he is significantly more explicit about describing his view of the recordings than he is when speaking to the recipient and Tufts employee who is there with his union rep. I chose this single investigator option, despite my concerns about Justin's bias, for deeply personal reasons. Reasons that I will not divulge in writing but would discuss over the phone if you wanted. [EX 8.]

On June 23 Dean Brizuela emailed Grievant to schedule a zoom meeting about the outcome of the OEO investigation. That meeting took place on July 1.

On July 7, Dean Brizuela send Grievant a "Notice of termination" stating, in relevant part,

> As outlined in OEO's report, the investigation found that you violated the Tufts Sexual Misconduct Policy and contributed to a hostile academic environment. In addition, the report concludes that you were not forthcoming during the investigation process which is also inconsistent with University policy. The report raises serious concerns by the judgment, accountability, and engagement with the University's procedures.
>
> After a thorough review of the findings and all applicable University policies, and after considering what you shared with us during our meeting on Tuesday, July 1, the University is terminating your appointment as Distinguished Senior Lecturer at Tufts University. This decision is based on the conduct described in the report in due consideration of our meeting of July 1. [EX 7.]

## RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT

### ARTICLE 3
### EQUAL EMPLOYMENT OPPORTUNITY AND NONDISCRIMINATION

3.1 It is the policy of the University not to discriminate on the basis of race, color, national or ethnic origin, age, religion, disability, sex, sexual orientation, gender identity and/or expression, genetic information, military or veteran status (special disabled veterans, disabled veterans and Vietnam-era veterans), or any other characteristic protected under applicable federal or state law. It is also a violation of University policy to retaliate against any individual for filing a complaint of discrimination or for cooperating in an investigation of alleged discrimination (protected activity). Unlawful discrimination has no place at the University and attends the University's core values, which include a commitment to equal opportunity and inclusion.

* * *

3.3 The Union acknowledges that, unlike other University employees, faculty covered by this Agreement are subject to University policies prohibiting discrimination and harassment, as referenced in this Article.

**ARTICLE 11**
**APPOINTMENTS**

11.10 The University also agrees that a faculty member who is terminated prior to the expiration of any appointment for misconduct or failure to abide by department, School, or University policies and procedures may grieve the termination under the Grievance and Arbitration Procedure under the standard of just cause.

**ARTICLE 13**
**DISCIPLINE AND DISCHARGE**

13.1 Discipline may include written warnings, unpaid suspensions, or discharge. A faculty member will not be disciplined, suspended, or discharged without just cause.

13.2 Discharge for purposes of this Agreement shall mean the termination of a faculty member's appointment prior to the expiration of that appointment.

**RELEVANT PROVISIONS OF TUFTS SEXUAL MISCONDUCT POLICY**
Revised September 2023

***Purpose:*** To establish a work, educational and living environment at Tufts University that is free from sexual misconduct, including sex and gender discrimination; sexual and sex and gender-based harassment; sexual assault and rape; sexual exploitation; stalking; relationship violence (including domestic and dating violence), and retaliation through guidelines to promote and foster a safe campus climate.

**I. POLICY STATEMENT AND SUMMARY**

* * *

**Prohibited Conduct:** Tufts is committed to providing a campus environment free of sex and gender-based discrimination, sex and gender-based harassment. To that end, Tufts prohibits sexual misconduct, that, under this policy, can include: (1) sex and gender-based discrimination; (2) sexual and sex and gender-based harassment (including a hostile environment based on sex or gender); (3) sexual assault; (4) sexual exploitation; (5) stalking; and (6) relationship violence (including dating and domestic violence). Under Tufts University policy, sexual misconduct can occur in any sex or gender configuration (i.e., between the same sex or different sex or gender) and regardless of actual or perceived sex, gender, gender identity, gender expression, and/or sexual orientation. Tufts also prohibits retaliation.

* * *

**University Response to Allegations of Sexual Misconduct:**

* * *

Violations of this policy are subject to disciplinary action. Depending on the nature of the violation, disciplinary consequences for violations of this policy may include denial of privileges disciplinary probation, suspension and expulsion for students, and may include warnings (verbal or written), emotions, suspensions, and termination for employees.

* * *

**III. DEFINING AND RECOGNIZING SEXUAL MISCONDUCT**

Sexual Misconduct is a broad term used in this policy to encompass unwelcome or unwanted sex or gender-based conduct and/or behavior of a sexual nature that is prohibited by Tufts University and may also be prohibited by federal and state law, including Title IX. The term *sexual misconduct* includes but is not

limited to prohibited behaviors often described as sex and gender discrimination, sexual harassment, sexual assault and rape, sexual exploitation, stalking and relationship violence (including dating and domestic violence). It can be a violation of this policy to commit these acts or to attempt to commit them. Also, as previously described, some sexual misconduct under this policy could be a violation of applicable federal and state criminal and/or civil law…. Sexual misconduct can occur in any sex or gender configuration (i.e., between those of the same sex/gender or a different sex/gender) and regardless of actual or perceived sex, gender, gender identity, gender expression or sexual orientation.

* * *

**B. <u>Sexual or Sex-and/or Gender-the Based Harassment</u>**

Tufts policy defines sexual harassment as a form of sex and gender discrimination that involves unwelcome or unwanted conduct of a sexual nature. It can include unwelcome or unwanted sexual advances, requests for sexual favors and other physical or verbal conduct of a sexual nature. Sexual harassment can include conduct directed at a person because of their real or perceived gender. Similarly, sex and/or gender-based harassment that is not sexual in nature is prohibited by this policy, and the University's Non-Discrimination Policy, and can also include conduct directed at a person because of their real or perceived sex and/or gender. This conduct violates Tufts policy when:

- It is made a condition of academic status or employment; or
- Refusing or submitting to the conduct is used as a basis for academic or employment decision; or
- The conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance.

Sexual and sex and/or gender-based harassment has the purpose or effect of unreasonably interfering with an individual's work, or academic performance if for example, it is sufficiently serious, pervasive and/or persistent as to create an intimidating, hostile, humiliating, demeaning, discriminatory or sexually offensive working, academic, residential or social environment under both an objective (i.e. a reasonable person's view) and subjective (the complainant's view) standard.

Some examples of unwelcome or unwanted conduct under Tufts

policy that could constitute sexual and/or sex and/or gender-based harassment include (but are not limited to):

- Sexual propositions
- Sexual advances – with or without touching
- Sexual jokes or describing sexual conduct
- Comments on an individual's body and/or appearance
- Comments about sexual activity, experiences, deficiencies or prowess
- Displaying sexually suggestive objects, pictures, cartoons and other images
- Sexual gestures, leering, whistling or innuendos of a sexual nature
- Unwelcome or unwanted contact – touching, hugging, brushing against a person's body, impeding or blocking movement
- Hostile or intimidating conduct such as yelling or screaming at an individual based on sex/gender
- Sexist statements and behavior
- Taunting slurs or other hostility for failing to conform to expected notions of masculinity or femininity
- Persistent requests for dates or sexual favors/activities
- Inappropriate gifts or communications (letters, telephone calls, emails, texts)
- Other sexual misconduct such as domestic or intimate partner/relationship violence and sexual assault (covered elsewhere in this policy)
- Use of pet names, nicknames or terms of endearment
- Intentionally and/or repeatedly refusing to adhere to a person's expressed in preferred gender pronoun or otherwise intentionally and/or repeatedly disrespecting the same

Sexual and/or sex and gender-based harassment can occur between and/or among students, staff, faculty, patient and/or third parties. Sexual and/or sex and gender-based harassment can occur between people of unequal power or between peers. A complainant does not have to be the direct recipient of the conduct; anyone affected and/or offended by the conduct may file a complaint. A complainant does not have to inform the respondent that the conduct is unwelcome, especially if it is not safe to do so in the moment it can report the conduct to OEO, HR, a Dean or a colleague (most of whom are obligated to report to OEO). . . .

* * *

**D. Sexual Exploitation**

* * *

**2. Photographing or Video/Audio Taping of Sexual Activity**
Photographing or taping someone (via audio, video or otherwise) involved in sexual contact, or in any state of undress, without their consent (as defined in Section II-A above) constitutes sexual exploitation and is a violation of this policy. The act of taking those images/recordings without consent is one form of sexual exploitation. Even if a person consented to the sexual contact or being in a state of undress, photographing or taping someone without consent goes beyond the scope of that original consent. Remember, consent to one act or behavior does not imply consent to other activities.

The act of sharing images such as photographs or video/audio of someone involved in sexual contact or in a state of undress, without their consent, constitutes an additional act of sexual exploitation that is separate from the act of taking the images/audio. This additional act of sexual exploitation can be committed by anyone in possession of the images, even if that individual was not responsible for the creation of the original images and was not engaged in the recorded sexual contact. Sharing those images or audio can be done by digitally forwarding and/or posting copies of the materials or by simply showing someone else those images without relinquishing possession. If an individual is interested in sharing these types of photographs or video/audio, they must obtain the consent of all persons involved in those images/recordings before showing or disseminating the images or recordings.

* * *

**3. Voyeurism**
Tufts policy defines voyeurism as the act of intentionally observing, spying on or listening to a person(s) involved in sexual contact or in any state of undress, without their consent. Voyeurism also occurs when an individual allows others to observe this behavior without the consent of all the person(s) involved.

* * *

**Code of Conduct, 2025-2026**

**IV. Policies Regarding Student Behavior**

* * *

**Y. Unauthorized Recording**

> Making or attempting to make audio, video, or photographic recordings of a person who has a reasonable expectation of privacy without (1) that person's consent, or (2) authorization under the Tufts video security policy is prohibited. Disseminating such recordings is also prohibited. People have an expectation of privacy in private areas such as locker rooms, residence hall rooms, and restrooms; and a person has an expectation of privacy if they ask not to be recorded even if they are in a public area. Tufts prohibits unauthorized recording of administrative or faculty meetings; to record a meeting, a student must obtain consent of all recorded parties. Malicious or negligent disclosure of private personal information also is prohibited.

**CONTENTIONS OF THE PARTIES**

Both parties referenced the "tests" arbitrators use to analyze whether the employer has established just cause for discipline. Albeit stated somewhat differently in their respective briefs, the tests include:

1) Notice: Did the employer give to the employee forewarning or foreknowledge of the possible or probable consequences of the employee's disciplinary conduct, or did the employee know of the work rule?

2) Reasonable rule: Were the employer's rules of managerial order reasonably related to (a) the orderly, efficient and safe operation of the employer's business, and (b) the performance that the employer might properly expect of the employee or was there a fair and reasonable work rule reasonably related to the orderly, efficient and safe operation of the school?

3) Investigation: : Did the employer, before administering the discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?

4) Fair Investigation: Did the employer conduct a fair and objective investigation prior to concluding that the employee committed the infraction and issuing discipline or was the employer's investigation conducted fairly and objectively?

5) Proof: At the investigation, did the employer obtain substantial evidence or proof that the employee was guilty as charged?

6) Equal Treatment: Has the employer applied its rules, orders and penalties even handedly and without discrimination to all employees or was the discipline consistent with previous discipline of other employees in similar circumstances?

7) Penalty: Was the degree of discipline administered by the employer in a particular case

reasonably related to (a) the seriousness of the employee's proven offense, and (b) the record of the employee in his/her service with the employer or was the degree of discipline issued related to the seriousness of the infraction and the employee's service?

The Employer's Contentions

The contentions made in the Employer's 57-page brief will be summarized succinctly, organized as the tests are set forth above.

The Employer contends that Grievant exhibited extraordinarily bad judgment by having noisy sex in his office, in an area where students were likely to be nearby and within easy earshot. Grievant had a chance to seek mercy when the University learned of his flagrant misbehavior and conducted an investigation. Instead, he added more layers of misconduct. All the traditional tenets of just cause are met.

1. NOTICE:

The Employer contends that there can be no dispute that Grievant was aware of the SMP prohibiting sexual misconduct. Not only is the SMP widely distributed and posted at Tufts, as required by law, but, as a member of every Union bargaining team since the creation of the unit, Grievant was directly responsible for language in the CBA subjecting all unit members to the SMP, by contractual mandate. More importantly, Grievant explicitly acknowledged that he was aware of the SMP, and he knew his actions with KM – engaging in explicit sexual activity in his office – directly violated it; removing all doubt as to the satisfaction of this second test. Grievant even acknowledged that his mendacious responses in the investigation stemmed from the fact that he knew he had violated the policy.

2. REASONABLE RULE:

The Employer contends that there was a fair and reasonable work rule reasonably related to the orderly, efficient and safe operation of the school. There is no dispute that Tufts maintains a legally-compliant SMP, ensuring that students, employees and all other community members are able to study and work in a safe environment, by prohibiting the type of behavior Grievant engaged in here. The Policy provides that sexual misconduct is a violation if the activity in question "has the purpose or effect of unreasonably interfering with an individual's work or academic performance." The Policy notifies all covered individuals (which includes Grievant), of the consequences for violations. Further, no reasonable person can claim that they were unaware that termination is a likely penalty for having sex in one's office, loud enough that a student can hear in the adjacent classroom.

3. INVESTIGATION:

The Employer contends that Investigator MacDowell, as overseen by AVP Zellmer, conducted an extremely thorough and detailed investigation that resulted in a finding that Grievant violated the SMP. The investigation concluded with Grievant admitting he engaged in

sexual misconduct that violated Tufts' Policy, which explicitly calls for termination. Grievant's shifting narrative throughout the investigation and even through the hearing clearly establishes a complete lack of credibility.

The Employer contends that the first three factors in a "just cause" analysis are specifically designed to protect a grievant's due process rights, i.e., to ensure that a grievant is not being held to a policy of which he was unaware, or that an employer is not simply going through the motions of an investigation and coming to a conclusion that is unsupported by the facts. Not only was the OEO's investigation thorough, fair, and comprehensive, Grievant acknowledged he knew about Tufts' Policy and he admitted to the misconduct. If the Union pursues its baseless argument that the investigation was somehow deficient, it cannot present any objective evidence that a "proper" investigation would have uncovered any exculpatory evidence or changed the findings in the Report. Grievant's only issue with Tufts' viewing of the video evidence was that it prevented him from continuing to push his false narrative. He conceded at the hearing – over objection by the Union – that Tufts was not prohibited from listening to the tapes or using them as part of their investigation.

4. FAIR INVESTIGATION

The Employer contends that, as to allegations of bias on the part of Investigator MacDowell, Grievant ultimately admitted to the misconduct and, more importantly, Grievant had the ability to remove Investigator MacDowell from the process. At the hearing Grievant admitted he chose the process to protect his girlfriend from potential cross-examination. While Grievant can argue the misplaced and tardy nobility of his decision, he cannot similarly argue that his rights were impacted based on alleged bias (none existed), when he could have chosen different decision makers.

The Employer contends that the Union's further argument that the investigation was flawed because of the types of questions KM was asked during the investigation, is equally baseless. KM was informed ahead of time that Tufts was investigating an allegation that she and Grievant were engaged in sexual acts in his office. It strains credulity that she was somehow unaware that the line of questioning during the interview would be related to her having sex with Grievant, especially since Grievant had informed her of the questions he was asked, prior to her meeting with Investigator MacDowell.

5. PROOF

As to the use of the tapes, the Employer contends that the Union misinterprets the statute which only provides for potential suppression in criminal matters, not civil. Further, in applying the Wiretap Statute, courts have routinely found that third parties who receive purportedly "illegal" wire taps – but had no part in obtaining them initially – are not prohibited from utilizing them, even in criminal proceedings.

The Employer contends that the statement in the Complaint can be accepted for the truth of the matter asserted, given it would clearly fall under the "excited utterance" exception to the

hearsay rule. The statement was made very soon after the event and, based on the statements in the Complaint, it is clear AW1 was still under duress from the experience. Also, the Complaint has proven to be the truth – supported both by Grievant's admissions as well as a recording of the actual activities. Even if, arguendo, there remains a question about whether AW1's statement should be accepted as truth, the Arbitrator is not bound by a technical evidentiary rule and can accept the information as fact, especially given that everything else provided by them has turned out to be accurate and has been corroborated. Hearsay is often admitted into evidence at arbitration where, as is the case here, the declarant is unavailable to testify.

The Employer contends that the reluctance to testify by a victim of Grievant's sexual misconduct should not be held against the Employer. Here, the Union demonstrated the types of questions with which it would have badgered the student-victim, i.e., the repeated comments and questions during the hearing stating that the student did not need to stay in the room while Grievant was engaged in sex. This is the type of "blame the victim" approach that does nothing to unearth the truth. Indeed, the information in the student's OEO Complaint was corroborated by Grievant's own admissions as well as an accurate recording of at least eight (8) minutes of the sexual activity. Grievant was in no way prejudiced by the student not appearing and their statement should be accepted as the truth – because that is what it was.

6. EQUAL TREATMENT

The Employer contends that, as to the question of whether other employees were treated in a more favorable manner after engaging in the same behavior, fortunately there have not been many examples of other faculty members engaging in sexual activity with their girlfriends within earshot of a student workspace. Dean Brizuela testified that, since she became Dean, there was one other example of a faculty member violating the SMP. Dean Brizuela made the same decision then as she did here: she decided to terminate the offender. Grievant cannot demonstrate he was treated in a disparate manner.

7. PENALTY

The Employer contends that the degree of discipline issued was related to the seriousness of the infraction and Grievant's service. Grievant brought his girlfriend to his office at a time when students were in the vicinity, they engaged in sexual activity loud enough to be heard by a Tufts student trying to do their homework. A student should never be exposed to a faculty member having sex in a nearby room. When you couple that behavior – which by itself is terminable – with the fact that Grievant knowingly lied during the investigation, demonstrating a clear lack of accountability and remorse, it is clear that the level of discipline was completely justified. Not only does Tufts have a general obligation to ensure the safety of its students, but, it has a legal obligation to maintain a workplace and academic environment that is free from sexual misconduct and harassment. Tufts met those obligations by terminating Grievant.

Further, the Employer contends that Dean Brizuela gave due consideration to Grievant's record and length of service at the University. However, she explained that working at Tufts for a certain length of time does not somehow grant that employee permission to have sex in his

office without consequences. No employee, no matter how many years they've been at a place of employment, should engage in sexual activity in their place of employment.

The Employer contends that Grievant repeatedly raised false claims of bias, despite admitting during the hearing that he knew at the time he was making these claims that he had, in fact, engaged in sexual activity with KM in his office. He chose to continue making groundless accusations against OEO investigators who were simply doing their jobs, rather than admit his behavior. This is not the behavior of someone who is deserving of leniency.

The Employer contends that the Union's argument that the sounds on the tape were not "loud" is an empty distraction. The sounds of Grievant and KM engaging in sexual activity was heard by the student sitting in the middle of the classroom. Grievant disavowed the Union's argument and acknowledged that sounds can be heard through the wall and, more importantly, that the specific sounds of Grievant's sexual activity were, in fact, heard by the student.

The Employer contends that any reference to "contentious" bargaining that recently took place and the Union's seeking public support during negotiations is irrelevant. Grievant, again, contradicted the Union's argument – admitting that Dean Brizuela, as the individual responsible for the termination decision, held no animus towards him.

CONCLUSION

The Employer contends that because there is no dispute that Grievant engaged in the alleged behavior and subsequently failed to provide any mitigating factors, Tufts had just cause to terminate him. Therefore, the grievance should be denied.

## The Union's Contentions

The contentions made in the Union's 82-page brief, which did not address all seven "tests," will be summarized succinctly.

The Union contends that if any of the "Seven Steps" questions are answered in the negative, it warrants the finding that just cause either was not satisfied or at least was seriously weakened in that some arbitrary, capricious, or discriminatory elements were present.

1. NOTICE:

The Union contends that Tufts failed to provide Grievant with notice of its SMP or of any definition of sexual misconduct different than hostile academic environment.

The Union contends that Tufts did not give Grievant forewarning of the possible consequences of his disciplinary conduct. Even if Dean Brizuela's termination email could be read to terminate him for sexual misconduct regardless of whether it created a hostile academic environment, Tufts failed to notify Grievant that consensual sexual activity in one's office is a per se violation of the SMP and compels termination.

4. FAIR INVESTIGATION:

The Union contends that Tufts failed to conduct a good faith investigation into the allegations because it solicited and relied on an unauthorized recording that violated Tufts' own policies, regardless of whether it violated the law. Due process is deprived where the investigation is conducted in violation of policies and the law, prejudges the outcome and misrepresents the evidence.

Here, Tufts' solicited and relied on a recording made by AW1 that violated state law. Section 99 of G.L. c. 272 prohibits non-consensual interception of wire or oral communication. It also violated the Student Code of Conduct policy which prohibits "audio, video, or photographic recordings of a person who has a reasonable expectation of privacy without (1) that person's consent…" but expansively defines a reasonable expectation of privacy to include public areas where individuals ask not to be recorded and administrative or faculty meetings without consent of all parties. As Tufts witnesses admitted, faculty have reasonable expectation of privacy in their private office. The SMP also prohibits voyeurism, which includes intentionally listening to persons engaged in sexual contact without their consent. Prohibited voyeurism occurs even when sexual participants fail to take sufficient precautions to prevent observation.

The Union is not asking the Arbitrator to direct Tufts to discipline AW1. But Tufts' deliberate forbearance toward AW1's (and Inspector MacDowell's) violations of the policies and law underscores the inconsistent application of SMP. The University's failure even to counsel AW1 (or Inspector MacDowell) about the illegality or inappropriateness of non-consensual recordings amounts to a license to make indiscriminate recordings of private activity upon any suspicion of impropriety, and to disregard Tufts' just cause obligations to teaching faculty.

The Union further contends that Investigator MacDowell's report and testimony relied on a stream of unsubstantiated claims, misstatements, inconsistencies and outright exaggerations that violate the duty under just cause to conduct an objective good faith investigation. In addition to mischaracterizing the sound level of sexual activity on the recordings, Investigator MacDowell repeatedly insisted that the recordings unequivocally depicted extremely specific sexual acts. It is not the error in his assertions that are troubling, as much as the hubris of Investigator MacDowell's error which undergirds his investigation.

The Union contends that Investigator MacDowell's gender bias extended to other parts of his investigation. He asked alarmingly graphic questions of KM that he did not ask of Grievant, such as whether they engaged in sexual activity in his office and if she watches pornography.

5. PROOF:

The Union contends that Tufts failed to establish that Grievant's admitted consensual sexual activity with a non-student in his office created a hostile academic environment because the University could not establish that Grievant acted based on the protected characteristics of AW1, or that the brief, largely inaudible sounds of sexual activity were sufficiently severe or

serious to have created a hostile learning environment. The failure of AW1 to testify, particularly where hearsay statements lacked rigor and reliability, meant that Tufts also could not establish that the activity was subjectively or objectively offensive, particularly where AW1 deliberately extended their exposure to the misconduct.

The Union contends that a hostile academic environment is analyzed the same as a hostile environment under other statutes. A hostile work environment claim requires 1) a member of a protected class, 2) who encountered unwelcome harassment, 3) that was based upon protected characteristic, 4) sufficiently severe or pervasive so as to alter the conditions of environment and create an abusive work environment and 5) the conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the employee subjectively perceived it to be so. The SMP's definition is consistent with the federal standard under Titles VII and IX. The University could not meet basic elements of this definition. The University's failings in proving its case were corroborated by AVP Zellmer's inability to articulate how Grievant violated the SMP, beyond stating: "He had sex in his office." Sexual activity in an office does not violate the SMP.

The Union contends that Grievant's conduct was not improperly motivated, based on or because of any protected category of AW1. Anti-discrimination law is designed to prevent workplace discrimination, not socially unacceptable behavior in general. Further, the defining element in hostile work environment cases is not that the conduct was sexual in nature, but that the harassment occurs because of the employee's gender. The SMP also requires an improper motive to find that an environment is hostile. Investigator MacDowell's report confirms that a finding of improper motive is necessary to establish sexual harassment via the hostile environment prong.

The Union notes that all Tufts witnesses agreed that they did not find, and there was no evidence of, Grievant engaging in sexual activity in his office with the knowledge or intent that a student, regardless of gender, sex or sexual preference/orientation/performance, was in the classroom next door. All Tuft witnesses agreed his activity was not because of the sex, or any other protected characteristic of AW1. In fact, no protected category was cited. AW1 was inappropriately exposed to momentary sexual activity, but it was not based on any protected category of AW1.

The Union contends that to determine whether the "sufficiently severe or pervasive" standard is met the U.S. Supreme Court requires consideration of the frequency of the conduct, its severity, whether it was physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it interfered with the person's work performance. An administrative law judge of the Massachusetts Commission Against Discrimination ("MCAD") observed: "it is rare that a single verbal comment, unaccompanied by physically threatening behavior, can meet this standard." The Union cites numerous cases holding similarly.

The Union contends that, in this case, AW1's single exposure to sounds of barely audible female sexuality, though troubling, did not meet the sufficiently severe or pervasive standard. AW1's exposure was not intended and AW1 asserted their exposure was inadvertent. AW1 also

viewed the conduct as dissonant with Grievant's history of professionalism. AW1's deliberate choice to extend exposure to allegedly offensive sounds, by recording the activity for nearly 10 minutes and hovering nearby for almost an hour in order to identify the participants (particularly to see if it was a specific student), further affirms the misconduct was not severely offensive.

The Union contends that Tufts could not establish Grievant's conduct was so subjectively and objectively offensive to establish a hostile academic environment. Tufts' failure to produce AW1 as a witness subject to cross-examination meant it could not establish Grievant created a hostile academic environment on subjective or objective grounds. The test is whether a reasonable person would find the challenged conduct hostile and abusive and whether the affected person, in fact, perceived the conduct as such. This determination is reinforced by the prevailing view that parties should have the right to cross examine witnesses, even in disciplinary arbitrations involving inappropriate conduct with a student.

The Union contends that, even if hearsay should be considered where a witness was unavailable or unwilling to testify, Tufts did not even make a perfunctory effort to seek AW1's participation for that exception to apply. Notwithstanding initial suggestions by Tufts that AW1 could not be contacted, AVP Zellmer admitted they could be. At a minimum, the Arbitrator should draw an adverse inference from Tufts' failure even to attempt to have AW1 testify. AW1 also asked to be kept up-to-date on the investigation, which Tufts did not do.

The Union contends that Grievant's admission that he engaged in misconduct that was sexual in nature did not excuse or lesson Tufts' burden to produce an indispensable witness. Grievant's admission did not establish his conduct was loud, audible or disturbing to AW1, or sufficiently severe, offensive or traumatizing that it interfered with their academic environment or it satisfied the subjective and objective elements of hostility.

The Union contends that there are substantial reasons to doubt the claim that AW1 genuinely was offended or traumatized, found the conduct sufficiently severe, or that it interfered with their educational environment. AW1's own actions contradict any pretense of offense. AW1 was not required to intervene, but their forbearance to alert Grievant and KM that their activity was audible, coupled with moving closer to the sound that they recorded for nearly 10 minutes, indicates a lack of genuine offense, hostility or interference. AW1's behavior indicates a willingness or salacious curiosity to expose themselves to the sounds. In addition, AW1's report made several unsubstantiated claims – about the volume, the mentions of "Ted", "easy access" or "take it off", and the dress and appearance of KM.

The Union contends that the hearsay evidence, even if taken to be true, reflects at most the emotional swings of an undergraduate with a concern for social justice and/or a competitive streak. AW1's initial fury was directed primarily at the prospect of Grievant having sex with a particular undergraduate. If Grievant's sexual partner was determined not to be a student, then AW1 demanded primarily that the office assignations cease. AW1 attended the next two class sessions after their exposure and resolved to stick with the course unless it was found Grievant had sex with a student. When finally asked an open ended question about the impact, AW1 articulated a feeling of awkwardness and an equivocal disinclination to take courses with

Grievant in the future.

The Union contends that efforts by Tufts to cherry-pick AW1's statements ("fear" "frozen in panic" "unsafe" "terrified" "I don't think I'll be signing up for his classes in the future") to establish the offensiveness or severity of Grievant's conduct should be rejected. Just cause requires that, to the degree hearsay is considered (particularly anonymous, unsworn and unrecorded), it should be construed in the light most favorable of the party deprived a chance to cross-examine.

The Union contends that, while on an objective standard a reasonable student had a right to be offended by Grievant's behavior, Tufts failed to establish that his misconduct could reasonably be viewed as sufficiently serious as to be hostile or interfere with their academic environment. No reasonable student would have regarded a single inadvertent exposure to barely audible female moans as so severe and hostile on the basis of sex so as to represent a condition of their education, rather than inadvertent exposure, or make them believe that such exposure was the price to pay for attending Tufts.

7. PENALTY:

The Union contends that while Tufts had just cause to issue discipline, just cause requires the punishment imposed to be related to the seriousness of the offenses, and in consideration of the employee's personal record and other mitigating factors. Tufts offered manufactured and untenable reasons to suggest that the offense was severe or involved aggravating factors, while ignoring abundant mitigating factors. Further, discriminatory motivation may reasonably be inferred based on temporal proximity (criticizing Tufts before Somerville City Council as quoted in Tufts student newspaper in late February 2025); vigorous concerted protected activity (active in organizing and all subsequent negotiations) and Grievant's other Union activities.

The Union contends that, while Grievant's misconduct may be regarded as serious, it was not fundamentally disqualifying for his position, such as fraud, plagiarism, predation, exploitation, violence, or similar acts that irreparably breach trust with a university or students. Grievant's activity was a single incident without the intent to expose anyone else to his behavior, let alone a student or based on protected category of any observer. Grievant has no reputation for lecherous or otherwise inappropriate behavior with regard to students or anyone else. AW1 even admitted that the activity was an exception to Grievant's usual professionalism.

The Union contends that the CBA does not single out activity of a sexual nature, or any other type of misconduct, for summary discharge. The SMP, likewise, as written and applied does not compel termination. Tufts has not sought termination for all faculty who violate the policy, even when deliberately directed toward a student or staff. Title VII and Title IX also do not compel termination, but require swift and prompt response to the allegation.

The Union contends that Tufts' arguments about severity of the offense rely upon inaccurate and exaggerated contentions. While Grievant should have known or assumed that a student could be in the adjacent classroom, the mischaracterization of the likelihood of students

being in a classroom near midnight on the first Tuesday after Spring Break when no assignments were due was not merely wrong, but evocative of the lack of just cause for termination. Tufts' exaggerations of the likelihood of inadvertent observers reflect more severity inflation.

The Union contends that, while the impact on AW1 is a relevant consideration on the level of discipline, Tufts grossly exaggerated that impact. AVP Zellmer wrote that Grievant's sexual activity occurred a few feet away from AW1, conveniently omitting that it was AW1 who placed themselves a few feet away, setting aside an A/V cart and endeavoring to record sound and images inside the office.

The Union contends that Tufts characterization depends on a deliberate disempowerment of AW1. Tufts refused to share a draft report with AW1 and failed to ask AW1 to certify its descriptions of their statements or its characterizations of the impact of Grievant's conduct on them. Tufts further failed to contact AW1 about the conclusion of the investigation as AW1 requested. Tufts did not let AW1 speak for themselves, instead preferring to serve as omniscient interpreter as to AW1's state of mind and reasoning. Tufts witnesses insisted on exaggerating AW1's timidity and attributed major psychological significance to their selection of the anonymous reporting option, a decision shared by 30 percent of reporters.

The Union contends that, although AVP Zellmer testified that Grievant's actions "resulted in a serious disruption to at least one student's academic experience," the only evidence of disruption was the student apparently having their alleged studies interrupted one night. This repeated mischaracterization of AW1 as traumatized willfully deny the impressive agency and resilience initially exhibited by AW1. AW1 headed toward and immersed themselves in "offensive" sounds, recorded them, stayed outside the office for nearly another hour, filed an OEO report, attended two subsequent classes taught by Grievant, intended to remain in the class so long as Grievant was not found to have copulated with a student, submitted to an interview, remained committed to course work, and asked to be keep abreast of the investigation progress. AW1 never described themselves as traumatized, instead expressing "I'm alright."

The Union contends that Tufts falsely accused Grievant of repeatedly denying engaging in sexual activity, while acknowledging his honesty was immaterial to the termination decision. Grievant credibly testified that he was not asked whether he had engaged in sexual activity in his office or even what happened in his office. Grievant understood that he was being asked to explain loud sexual sounds of intercourse with a student or someone calling him "Ted" coming from his office. Grievant knew that what actually transpired in his office could not explain AW1's report: it was neither loud nor with a student, and involved neither intercourse nor a person who called him "Ted." Inspector MacDowell testified with "100 percent" certitude that he directly asked Grievant whether he had engaged in sexual activity in his office. Yet neither set of notes indicates a direct query, in contrast to what is indicated by both sets of notes of the KM interview.

The Union contends that Grievant's failure to volunteer his sexual activity, when he reasonably believed it could not explain AW1's report of loud sexual intercourse with an undergraduate, does not amount to a denial. Grievant was under no obligation to disclose

incriminating information if not asked. This reticence is even more understandable when it involves an act of extra-marital intimacy. The incendiary nature of the assertion that Grievant denied sexual activity once or several times is not merely incorrect, but exposes the flaws of Investigator MacDowell's credibility and objectivity as an investigator, and ultimately the lack of just cause to terminate Grievant. In any event, Grievant ultimately admitted to engaging in sexual activity in his office prior to the investigation's conclusion.

The Union contends that Grievant did not express bad faith concerns about due process, bias, wiretap, or motive. Investigator MacDowell, AVP Zellmer and Dean Brizuela faulted Grievant for questioning or criticizing the investigation, the investigator and AW1. Dean Brizuela even intimated that her decision to terminate was based upon Grievant's alleged criticisms of the investigation. These sentiments mischaracterize Grievant's modest expression of good faith concerns and suggest Tufts retaliates against employees who dare to question actions of Tufts administrators, even when falsely accused of having sex with a student.

The Union contends that Grievant's concerns about Inspector MacDowell's bias or lack of fairness were legitimate. Inspector MacDowell asked different and more graphic questions of KM than Grievant, never asked Grievant directly about engaging in sexual activity in his office and misrepresented the clarity, volume and contents of the recording. Grievant expressed legitimate concerns about the legality of the recording made by AW1 and Tufts' reliance on it. It is appropriate for a longstanding Union steward to express concerns about the precedent set by reliance on recordings of private faculty spaces, contrary to Tufts policies, including the SMP.

The Union notes that the accusations occurred at a time when Grievant had a tense relationship with a Set Design student who was flailing and prone to making fibs. Grievant did not frame his concerns about AW1 within a zero-sum construct, e.g., AW1's purported motive established Grievant did nothing wrong. Tufts did.

The Union contends that just cause requires consideration of mitigating factors, including length and quality of service, whether misconduct was directed at specific employee, personal circumstances, and role in the Union. This incident was the first infraction of an otherwise unblemished and lengthy career of service to Tufts, students and community. AW1 acknowledged Grievant's skills as teaching faculty and his longstanding maintenance of professional boundaries. Grievant has been an exemplary teaching professor and practicing professional designer, as demonstrated by Tufts' promotion of him to highest rank and payment of Excellence and Equity enhancements. Grievant has also been a longstanding steward and Union representative on pivotal bilateral committees. His conduct was not directed at AW1 or anyone else. Grievant expressed genuine contrition for his behavior, which was accepted and applauded by Dean Brizuela. There is no credible suggestion to question Grievant's stated willingness to abide and conform his behavior to expectations.

CONCLUSION

The Union acknowledges that Tufts had just cause to discipline Grievant for private consensual sexual activity in his office, even if it did not create a hostile academic environment

or otherwise violate the SMP. However, for the afore stated reasons, the Union respectfully requests that the grievance be sustained, that Grievant be offered reinstatement, that he be made whole, and that he receive a written warning.

**STIPULATED ISSUE**

Was Tufts' termination of Grievant supported by just cause? If not, what shall be the remedy?

**FINDINGS**

The Employer has the burden of establishing just cause for termination by a preponderance of the evidence. To do so, the Employer must affirmatively pass each of the seven tests.

> *1) Notice: Did the employer give to the employee forewarning or foreknowledge of the possible or probable consequences of the employee's disciplinary conduct, or did the employee know of the work rule?*

The Employer cites Article 3.3 of the CBA in support of its argument that Grievant was aware of the SMP. The Union's argument that the Employer did not submit proof that Grievant actually received a copy of the SMP is unavailing on this record. Grievant has been actively involved in Union activities. In his Rebuttal, Grievant stated:

> In my work with the union over the years I have heard many complaints about the Title IX process, with people suggesting that it is used as a vehicle to attack faculty and suggesting there is no due process but rather a presumption of guilt.[Employer X 2, Appendix I.]

Further, Grievant testified that he knew his behavior was an infraction, stating:

> Q. Okay. You knew it was an infraction of Tufts' policies, correct?
> A. Yes.
> Q. And you knew it was inappropriate to engage in sexual activity in your office, correct?
> A. Correct.
> Q. And you don't make any distinction between sexual intercourse, oral sex, digital penetration or any of those things, correct? All of that gets into the soup of this is inappropriate behavior, correct?
> A. Correct. [Tr. 444-445]

That statement demonstrates Grievant's familiarity with the policies at issue here.

Given Grievant's actual knowledge of the SMP, the fact that the Employer did not introduce evidence showing Grievant personally received a copy of that policy, such as an acknowledgment recorded in his personnel file, is irrelevant. The Employer has established by a preponderance of the evidence that Grievant had notice of the SMP.

> *2) Reasonable rule: Were the employer's rules of managerial order reasonably related to (a) the orderly, efficient and safe operation of the employer's business, and (b) the performance that the employer might properly expect of the employee or was there a fair and reasonable work rule reasonably related to the orderly, efficient and safe operation of the school?*

The Union does not contest that the Employer's rule was reasonable.

> *3) Investigation: Did the employer, before administering the discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?*

The Union does not contest that the Employer undertook an investigation.

> *4) Fair Investigation: Did the employer conduct a fair and objective investigation prior to concluding that the employee committed the infraction and issuing discipline or was the employer's investigation conducted fairly and objectively?*

The Employer put forth the experience and credentials of AVP Zellmer and Investigator MacDowell, establishing their competence to conduct OEO investigations. Investigator MacDowell interviewed all known witnesses to the incident.

On April 18, after he and KM had been interviewed and Grievant knew the questions Investigator MacDowell had asked, Grievant could have chosen the process under the SMP, i.e., adjudication by a panel. Instead, Grievant chose the discrimination complaint process under the DCPG, meaning Investigator MacDowell would submit a report to OEO. At the arbitration hearing Grievant explained that he made that decision to protect KM from having to testify at a hearing before a panel, given a past traumatic experience she had to testify about earlier that year in another matter. Nonetheless it was his choice.

AW1 had reported that she overheard "moans" and did not know if it was "another student." (EX. 1, pg.1) Investigator MacDowell's questions, to Grievant and KM, were based upon that report and upon his viewing of AW1's recording. The Union has cited no requirement that Grievant be allowed to view the recording prior to being questioned. Grievant was given the opportunity to respond to Investigator MacDowell's draft report, view the recording, and he did

both. The Union has not established any bias on the part of Investigator MacDowell that impacted his investigation.

The Union strongly objects to any reliance upon the recording, on the basis that the non-consensual recording violated the Massachusetts wiretap law, citing Vincent P. Birbiglia vs. Saint Vincent Hospital, Inc., and other cases. In Birbiglia, the SJC held that:

> The judge properly denied the hospital's motion for judgment n.o.v. on the count of the complaint alleging that the hospital violated the Massachusetts wiretap statute, G. L. c. 272, s. 99 Q. Section 99 Q provides that "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by" s. 99 has a civil cause of action against the person who intercepted, disclosed, or used such communications. An interception includes a secret recording. G. L. c. 272, s. 99 B 4.

That ruling establishes that a person who was a victim of a non-consensual recording has a civil cause of action.

On April 14, while Investigator MacDowell's investigation was proceeding, Grievant wrote to AVP Zellmer about his concerns "on the legality of the recording" and said he was consulting a lawyer. (UX 9.) On April 22 Grievant wrote to Investigator MacDowell:

> I understand that you have asked Tufts legal about this and they said that because the building is a public space, the recording is legal. However, Massachusetts is a two-party consent state, meaning both parties need to consent to being recorded. Every attorney I have consulted with and source I've looked at maintains that the two party consent law applies to both private AND public space
>
> * * *
>
> Even though the laws are rarely prosecuted and I have no intention of pursuing it, the complainant in this case would be open to prosecution and civil litigation. I do not understand how is it legal to use this recording in your investigation. [EX 2, Appendix F.]

In the Investigation Report Investigator MacDowell addressed that issue as follows:

> ... Whether it was unlawful for the reporting party to make the recording is a separate question from whether it constitutes relevant evidence for purposes of this proceeding. There is no "exclusionary rule" which prohibits the consideration of this evidence. [EX 2 at 7, fn. 8.]

The Employer's cites justify use of the recording in this investigation on the basis that the Massachusetts Wiretap Statute only provides for potential suppression in criminal matters, not civil. G. L. c. 272, § 99, P. Even in a criminal matter, when the "using" party was not involved in intercepting the communication, it is not prohibited from using it. In *Simpson v. Boston Public Health Comission*, No. 2084CV02869, 2025 WL 3566279, (Mass.Super. Nov. 24, 2025) the Superior Court concluded:

> that the Wiretap Statute does not bar the use in evidence of the recording at issue in this case, or transcripts of that recording. Nothing in the Wiretap Statute bars the use of an allegedly illegally obtained communication in a civil proceeding. See McDermet v. DirecTV, LLC, No. CV 19-11322-FDS, 2021 WL 217336, at *5 (D. Mass. Jan. 21, 2021) (denying motion to strike transcripts of recordings submitted on summary judgment, concluding that "[e]ven if defendants are correct that McDermet obtained and disclosed the recordings illegally [in violation of G. L. c. 272, § 99], that is not a sufficient basis to strike them or the corresponding statements of fact."); London-Sire Recs., Inc. v. Doe 1, No. 04CV12434-NG, 2009 WL 10728828, at *1 (D. Mass. Jan. 9, 2009) ("Neither the rules of evidence nor the Fourth Amendment bar the use of evidence arguably unlawfully obtained by private parties in their private suits."). The only remedies provided in the Wiretap Statute are criminal and civil penalties, not exclusion of evidence in a civil proceeding. *Id.* Indeed, the Wiretap Statute contains explicit provisions about the use of illegally obtained communications in evidence, but those provisions are limited to criminal trials; there are no provisions limiting the use of such communications in civil trials.

Therefore, the Employer's use of and reliance upon the recordings made by AW1 does not undermine the fairness of the investigation.

As the Employer noted in its brief, Grievant conceded that the investigation was conducted fairly, stating:

> Q. So you're not suggesting that, because you made that decision [to use the discrimination complaint process], the investigation was unfair in any way?
> A. I'm not suggesting that, no. [Tr. 461.]

For the above reasons, the Employer has established by a preponderance of the evidence that the investigation was conducted fairly.

> *5) Proof: At the investigation, did the employer obtain substantial evidence or proof that the employee was guilty as charged?*

As stated in the Notice of Termination, Grievant was terminated for the following reasons:

> As outlined in OEO's report, the investigation found that you violated the Tufts Sexual Misconduct Policy and contributed to a hostile academic environment. In addition, the report concludes that you were not forthcoming during the investigation process which is also inconsistent with University policy. The report raises serious concerns by the judgment, accountability, and engagement with the University's procedures. [EX 7.]

The referenced OEO findings state, in relevant part, in the conclusion:

> The analysis therefore turned on whether Respondent's conduct violated the Sexual Misconduct Policy by creating a hostile academic environment for AW1. The evidence demonstrated that AW1, positioned in an adjacent room for legitimate academic purposes, involuntarily heard over eight minutes of graphic sexual activity originating mere feet away. AW1 reported experiencing immediate discomfort, revulsion, and an intention to forgo future course work with Respondent despite an academic interest in his discipline. These undisputed reactions satisfy the SMP's requirement that conduct be both subjectively and objectively offensive: a reasonable member of the University community would likewise find audible sexual intercourse by a faculty member in a departmental office "intimidating, humiliating, demeaning, or sexually offensive." [EX 2, pg. 11.]

The SMP defines sexual harassment "as a form of sex and gender discrimination that involves unwelcome or unwanted conduct of a sexual nature." The Employer has established by a preponderance of the evidence that Grievant engaged in sexual activity in his office on March 25-26, within the hearing of AW1, conduct that was "unwelcome" and "unwanted." The SMP then states:

> This conduct violates Tufts policy when:
>
> * * *
>
> - The conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance.
>
> Sexual and sex and/or gender-based harassment has the purpose or effect of unreasonably interfering with an individual's work, or academic performance if for example, it is sufficiently serious,

> pervasive and/or persistent as to create an intimidating, hostile, humiliating, demeaning, discriminatory or sexually offensive working, academic, residential or social environment under both an objective (i.e. a reasonable person's view) and subjective (the complainant's view) standard.

With respect to the SMP, Investigator MacDowell testified:

> Q. Okay. That's great, that's what the policy says, but it's not the question I asked you.
> The question I asked you is, you didn't make any finding that there was an intent of [Grievant] to have the student overhear this; is that right?
> A. It's not an element of the policy.
> Q. You did not make any finding that [Grievant] intended for the student to overhear this; is that right?
> A. Yeah. [Tr. Pg. 90.]

Thus, it is AW1's inadvertent overhearing of Grievant's sexual misconduct that is at issue.

The Union objects to the Employer's reliance on AW1's recording and statements on the basis that they are hearsay and AW1 was not called as a witness. To the extent that the "excited utterance" exception to the hearsay rule applies and a looser application of the hearsay rule applies in arbitration, as the Employer contends, the entirety of AW1's reporting must be considered.

Grievant, in his Rebuttal to Investigator MacDowell's draft report, admitted that on the night of March 25-26 he and KM "let our emotions get the best of us." The difficulty with the OEO findings is the conclusion that Grievant's conduct created "a hostile academic environment for AW1." AW1's initial report on EthicsPoint stated:

> I have his class tommorow [*sic*] and I am afraid of going back because <u>I do not know if what I overheard was another student</u> or professer [*sic*]. . . . They also took a pause to talk about "color scheme" <u>which makes me nervous it's a student.</u> [EX. 1, pg. 1. *Emphasis added. Typos original.*]

In AW1's first response to Investigator MacDowell in EthicsPoint they say:

> I don't mean to accuse, but I'd rather be wrong <u>than allow someone to get hurt</u>. EX. 1, pg. 2. *Emphasis added.*]

After uploading their recordings for Investigator MacDowell to review, AW1 says, again in EthicsPoint:

> Thank you for your work and time on this. I don't want to over step in the process but if any actions are taken in the future I would appreciate being updated (as much as is allowed). I really like the classes he teaches but I can't see myself taking them if he is the professor in the future. So that's mainly what I would like to know about if that changes. Again, thank you. [Ex. 1, pg. 3. *Emphasis added.*]

Investigator MacDowell's notes of his interview with AW1 state, in part:

> JM: Could you tell if the other individual was a student, staff member, or someone else from the conversation or context:
>
> A: Yeah so that was my main concern, and I know like I overheard, I was kind of frozen in place so it sound creepy that I witnessed it and stayed but I was nervous it was a student, like someone I know who kisses up to him in class a lot. So they had banter and said "color choices" so that made me think it was someone like a student. Also could be a professor.
>
> JM: You mentioned seeing someone exit the office around 12:20 a.m. Can you explain how you saw that? Did you leave the room you were in to watch the hallway?
>
> A: So I really wanted to make sure it wasn't the girl I thought it was, cause she does his work study, so I went in the hallway that' s behind the office and went on my phone. [EX 1, pgs. 5-6. *Emphasis added.*]

Investigator MacDowell testified that:

> My main concern was that there was sexual activity with a student. That was our first – that was what brought this – you know, brought the formal investigation. [Tr. 102.]

The above-quoted remarks all point to AW1's main concern being that Grievant was engaged in sexual activity with a student, in fact, a specific student. AVP Zellmer also testified that AW1 was "very concerned" that another student was involved and that was their "primary concern." (Tr. 193.) AW1 plainly was not so traumatized by what they overheard that they fled. Instead, AW1 moved closer, tried to peek into Grievant's office, and used their phone to take videos under the door.

Further evidence that this incident did not have "the effect of interfering with [AW1's] academic performance" is found in the following Q and A, also from Investigator MacDowell's interview with AW1:

> JM: How did this situation affect you at the time, and how do you feel now?
>
> A: Im alright, cause thankfully I already have a therapist so I just called her, but like to be honest, I had to go to class the next day, and its just such a weird dissonance cause he doesn't act like that to us so I wouldn't expect it. Its really creepy if im honest, like I haven't dropped the course because I don't know for sure, like if I knew it was a s student id prob drop the course, im dtryin to ignore it. I don't think ill be signing up for his classes in the future. [EX 1, pg. 6. *Emphasis added. Typos original.*]

AW1 showed up at Grievant's class the following day and did not drop his course.

AW1 had specifically asked to be kept informed, "as much as is allowed." AW1 mainly wanted to know "if that changes," clearly referring to their notion that it had been a student in Grievant's office. While the Employer has laid on Grievant the responsibility for AW1's ambiguous reluctance to take classes from him in the future, and possibly change the focus of her studies, AW1 plainly would have been reassured if, as they asked, they had been informed of the outcome of the investigation, i.e., that AW1 overheard Grievant with a friend, not a student. Investigator MacDowell testified that "[t]hey didn't respond to our EthicsPoint messages at some point." (Tr. 114.) However, AVP Zellmer testified about the use of EthicsPoint as follows:

> Q. . . . are you able to reach out to the individual who was reporting anonymously?
> A. Yeah. We could always do that. We could do it today.
> Q. Okay. So you can actually do something that would contact that individual
> A. Uh-huh.
> Q. And how would they be contacted?
> A. It's anonymous. So they would get an email saying, "Somebody at EthicsPoint is asking you to talk. [Tr. 220.]

Grievant, in his Rebuttal to Investigator MacDowell's draft report, admitted that on the night of March 25-26 he and KM "let our emotions get the best of us."

For the above reasons, The Employer has established by a preponderance of the evidence that Grievant violated the SMP by engaging in sexual activity in his office on March 25-26. However, the preponderance of evidence does not establish that his conduct contributed to a hostile academic environment for AW1.

In addition, the preponderance of evidence, via Grievant's admission at the arbitration hearing, establishes that he was not forthcoming during the investigation process, contrary to University Policy.

> *6) Equal Treatment: Has the employer applied its rules, orders and penalties even handedly and without discrimination to all employees or was the discipline consistent with previous discipline of other employees in similar circumstances?*

Dean Brizuela testified about a case within the last 18 months of a professor engaging in a sexual relationship on campus. Following the OEO investigation she proceeded to initiate the tenure revocation procedure. That faculty member decided to resign.

By a preponderance of evidence the Employer has established that Dean Brizuela applies the rules evenly, without discrimination.

> *7) Penalty: Was the degree of discipline administered by the employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense, and (b) the record of the employee in his/her service with the employer or was the degree of discipline issued related to the seriousness of the infraction and the employee's service?*

The preponderance of evidence does not support a finding that termination was reasonably related to the seriousness of Grievant's proven offense. As quoted more fully above, Investigator MacDowell concluded that Grievant's conduct was both subjectively and objectively offensive, because a reasonable member of the University community would find audible sexual intercourse by a faculty member in a departmental office "intimidating, humiliating, demeaning, or sexually offensive." [EX 2, pg. 11.]

AVP Zellmer's close out letter and Dean Brizuela's termination letter rest on the conclusions reached by Investigator MacDowell. However, the record does not support Investigator MacDowell's critical conclusion that Grievant engaged in sexual intercourse, rather than lesser sexual misconduct. His conclusion solely represents Investigator MacDowell's interpretation of the recording.

Grievant credibly testified, on cross examination, that there was no actual penetration, digital or otherwise, and no oral sex. He admitted to rubbing KM's genital area and that her chest was exposed, but denied that any of his clothes were off. He stated that she had her dress and coat on through the entirety.

The SMP states:

> Violations of this policy are subject to disciplinary action. *Depending on the nature of the violation,* disciplinary consequences for violations of this policy may include denial of privileges disciplinary probation, suspension and expulsion for students, and *may* include warnings (verbal or written), emotions, suspensions, and *termination* for employees. [EX 2, Appendix A.

*Emphasis supplied.]*

It is appropriate and consistent with just cause that the consequences of Grievant's sexual misconduct, i.e., making out and petting with his girlfriend, in his private office, late at night, be treated with more leniency than the case cited by Dean Brizuela.

Grievant undisputedly had a long and stellar record at Tufts. In his rebuttal he explained, as follows:

> I am in my third decade of teaching at Tufts. In my time here I have helped to build our design and production program into one of the most reputable in the Boston area. I have routinely carried a course load of 8 or more even though I am only required to teach six. I often work into the summer months even though I am off contract. My courses routinely receive 4s and 5s in evaluations and I frequently hear that the classes are not simply good but among the best they have taken at Tufts. During COVID I was the one in our department who pushed for us to develop online content, creating new classes for the covid years and pushed us to continue producing virtual productions to keep the arts alive during one of our most challenging times. During all of this I was working closely with students who had anywhere from a passing to professional interest in my course offering. In addition to the course work, students have come to me with personal problems, family problems, relationship problems, room mate problems, domestic violence situations and mental health issues. I have had parents tell me their child would not have graduated had it not been for me. I have had students call me at 5 am to ask me if I would drive them to a hospital to check in because they were feeling unstable. I have even had a former student write me years later to say that my classes had literally saved their life. They had been feeling suicidal as a result of some trauma and my course work was the thing that inspired them to push through. Students do not confide these things in their advisors and teachers if they do not trust them and feel safe with them.
>
> I recognize that this incident is a breach of that trust, but that is an isolated incident in an otherwise unblemished record. Aside from the standard interpersonal issues that inevitably come up when collaborating on an artistic work, there has not been a single complaint about me in 23 years. There was a brief moment on the 25th when one thing led to another, quietly behind closed doors in the late hours. It was not the smartest decision I ever made to be sure. If I could apologize directly to the student who was involved I would, but I do understand that is not possible. What I can do is

> offer assurances that this will not happen again. I can refrain from having visitors or if I do keep the door open to prevent the appearance of impropriety. I can certainly promise that the next 20 years will also be unblemished. I believe I have been an excellent citizen of Tufts and fully intend to continue doing so. [EX 2, Appendix I, pgs.8-9.]

None of the above was contradicted in any way by the Employer.

On this record just cause is served by offering Grievant reinstatement with full seniority and with a written reprimand on his record for violation of the SMP. However, in light of his failure to be forthright in the investigation, the reinstatement will be without back pay or any other benefits that would have accrued since his termination.

**AWARD**

The grievance is sustained to the extent that Tufts shall offer Grievant reinstatement with full seniority and with a written reprimand on his record for violation of the SMP. However, the reinstatement will be without back pay or any other benefits that would have accrued since his termination.

Elizabeth Neumeier

Elizabeth Neumeier, Arbitrator

September 9, 2026